# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES A. DENNIS, | : | |
| Petitioner, | : | CIVIL ACTION |
| | : | No. 11-1660 |
| v. | : | |
| | : | THIS IS A CAPITAL CASE |
| JOHN E. WETZEL, et. al., | : | |
| Respondents. | : | |

August 21, 2013                                                                    Anita B. Brody, J.

## MEMORANDUM

James Dennis, the petitioner, was wrongly convicted of murder and sentenced to die for a crime in all probability he did not commit. I will grant Dennis' habeas petition, vacate his conviction and death sentence, and require the Commonwealth to retry Dennis within 180 days or let him free.

*        *        *

In this habeas petition brought pursuant to 28 U.S.C. § 2254, Petitioner James Dennis ("Dennis") brings an assortment of claims challenging the legality of his conviction and death sentence he received for killing Chedell Williams in 1991. I will grant Dennis' petition on the basis of exculpatory and impeachment evidence that the Commonwealth improperly withheld from the defense at the time of trial, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. While each piece of withheld evidence is, on its own, sufficiently prejudicial to entitle Dennis to a new trial, there can be no question that the cumulative effect of the Commonwealth's *Brady* violations abridged Dennis' constitutional right to due process of law. In the interest of avoiding unnecessary rulings on constitutional questions, I reserve decision on

1

Dennis' remaining claims. *See Jamison v. Collins,* 291 F.3d 380, 392 (6th Cir. 2002).

## I.      FACTUAL BACKGROUND

On October 22, 1991, two high school students, Chedell Williams and Zahra Howard, were walking up the steps of the Philadelphia Fern Rock SEPTA station when two men approached them yelling, "Give me your fucking earrings!" The girls fled down the steps; Howard hid behind a nearby fruit stand, while Williams ran into the street. The two men pursued Williams. One of them held a gun to her neck and shot her. The men then fled up the street, where they jumped into a car and sped away. Witnesses said there must have been a third participant who drove the vehicle, given how fast the perpetrators left the scene. Emergency services arrived within minutes, but Williams was pronounced dead at the hospital shortly after the shooting. Her earrings were missing, but her necklace and ring were untouched.

Dennis' conviction was based solely on shaky eyewitness identifications from three witnesses, the testimony of another man who said he saw Dennis with a gun the night of the murder, and a description of clothing seized from the house of Dennis' father that the police subsequently lost before police photographed or catalogued it. In short, Dennis' prosecution was based on scant evidence at best. In the process, the Commonwealth covered up evidence that pointed away from Dennis. It ignored Dennis' own explanation for where he was at the time of the murder: taking a bus from his father's home to the Abbotsford Homes project. It allowed a witness who saw Dennis on that bus to give incorrect testimony about what time that interaction occurred. Police never recovered a weapon, never found the car that witnesses described, and never found the two accomplices. Despite Dennis' lack of significant criminal history,[1] the Commonwealth charged him with a capital crime. There was virtually no physical evidence

---

[1] Dennis' only conviction was for possession, not distribution, of a controlled substance.

presented at trial; Dennis was convicted almost entirely through eyewitness identification.[2] Although the crime was committed by at least two people, Dennis was the only person ever arrested or convicted for the crime.

There were numerous flaws with the investigation and prosecution of this crime, flaws that significantly diminish confidence in the outcome. The police focus on Dennis stemmed from neighborhood rumors that he had been involved. This focus appears to have led police to overlook disparities between the eyewitness descriptions of the shooter and Dennis, most importantly their descriptions of the shooter's size. All five of the nine eyewitnesses who provided an estimate of the shooter's height in their statements to the police described the shooter as between 5'7" and 5'10", with four describing him as 5'9" or 5'10". Not a single eyewitness described the shooter as small, short, or petite. However, Dennis is only 5'5" and 125-132 pounds, significantly smaller than the descriptions of the shooter. NT 10/14/92 at 74-75. Moreover, the victim, Williams, was 5'10", Postmortem Report, Pet'r's Br. Ex. 87, and yet none of the witnesses remarked that the shooter was much shorter than Williams, even though the shooter and Williams were standing close to each other when the shooting occurred.[3]

Police showed most of the eyewitnesses photo arrays with Dennis' photo. Not one

---

[2] According to the amicus brief filed in this case by the Pennsylvania Innocence Project, in 36 percent of the Innocence Network's DNA-based exonerations, multiple witnesses misidentified the same innocent person. Brief for the Pennsylvania Innocence Project, et. al. as *Amici Curiae* 3 (hereinafter "Innocence Project Brief"). In a study of 250 cases in which defendants were exonerated after conviction, Professor Brandon L. Garrett found that eyewitnesses misidentified 76 percent of the exonerees (190 of 250 cases). *Id*. at 6 (citing Brandon L. Garrett, Convicting The Innocent: Where Criminal Prosecutions Go Wrong 48 (Harvard 2011)). As the Third Circuit has said, "[M]istaken eyewitness identifications are responsible for more wrongful convictions than all other causes combined. . . . [E]yewitness evidence presented from well-meaning and confident citizens is highly persuasive but, at the same time, is among the least reliable forms of evidence." *United States v. Brownlee*, 454 F.3d 131, 142 (3d Cir. 2006) (internal quotation marks omitted).

The Innocence Project found that over 175 people have been wrongfully convicted based in part on eyewitness misidentification; they were later proven innocent through DNA testing. Innocence Project Brief at 6. Unfortunately, there is no DNA evidence here that could definitively prove Dennis' guilt or innocence.

[3] Indeed, one eyewitness, David Leroy, told investigators for the defense, after the trial, that the shooter "was just a little taller than" Williams. 1997 Leroy Stmt., Pet'r's Br. Ex. 47.

confidently selected Dennis right away. One witness, Thomas Bertha, hesitated at first but then positively picked Dennis' photo. 10/25/91 Bertha Stmt., Pet'r's Br. Ex. 29. Howard, who was with Williams at the time of the murder, was less certain, and said that Dennis' photo "looks like the guy but I can't be sure. . . . He looks a little like the guy who shot Chedell." 10/25/91 Howard Stmt., Pet'r's Br. Ex. 45. James Cameron, a SEPTA worker who saw both the struggle and the shooting, viewed a photo array and said that Dennis' picture "looks familiar but I can't be sure." 10/25/91 Bertha Stmt., Pet'r's Br. Ex. 28. Notwithstanding their relatively uncertain identifications of Dennis in the days immediately following the shooting, these three individuals would ultimately become the Commonwealth's only testifying eyewitnesses. At trial, after each had seen Dennis' photo and his face in person during a line-up,[4] each of these witnesses identified him as the shooter without hesitation.[5] Meanwhile, four other eyewitnesses did not pick Dennis as the shooter: Three did not pick his photo from the photo array, and a fourth, who tentatively identified Dennis' picture, later chose another suspect from a line-up.[6] Detectives never reported showing the ninth eyewitness, George Ritchie, a photo array, but years after the trial, Ritchie testified that he had in fact been presented with a photo array, and that the police

---

[4] "That some (but notably not all) of the witnesses went on to identify Mr. Dennis in a life lineup two months after providing only tentative photo array identifications indicates that their memories of the photo array may have 'replaced' their memories of the actual event. Or, more simply, that Mr. Dennis was familiar to them because they had seen his photo previously, and had no prior exposure to the other members of the lineup." Innocence Project Brief at 19.

[5] "[F]ully seventy-seven percent of witnesses in known misidentification cases initially indicated some level of uncertainty in their identifications while going on to testify to relative certainty of that identification at trial." Innocence Project Brief at 15.

[6] Witness Anthony Overstreet originally identified Dennis during a photo array, saying that his photo "looks like" the shooter, but then failed to pick him out during a line-up and instead selected another participant. Pet'r's Br. Ex. 56; NT 9/21/92 at 84. Witnesses David Leroy, Joseph DiRenzo Jr., and Joseph DiRenzo, Sr., did not pick Dennis out of a lineup. 10/28/91 Act. Sheet, Pet'r's Br. Ex. 70; DiRienzo Jr. Stmt., Pet'r's Br. Ex. 40; DiRienzo Sr. Stmt., Pet'r's Br. Ex. 41.

"[S]cientific evidence has shown that non-identifications of a suspect provide important evidence of innocence and of misidentification by other witnesses who do make a positive identification of a suspect. . . . In [one 1980 study], non-identifications were shown to be *more* probative of innocence than suspect identifications were of guilt." Innocence Project Brief at 21.

had grown agitated when he could not pick out a suspect. PCRA Evid. Hrg. NT 5/6/05 at 35-39.

Further, the police arguably conducted misleading line-ups and identifications. After his arrest, Dennis volunteered to participate in a line-up. Although the defense requested that all eyewitnesses be present, the Commonwealth provided only four of the nine who gave statements immediately after the murder. Incidentally, the four were the only witnesses who had already initially identified Dennis from a photo array. Because discovery had not yet been exchanged, Dennis' lawyer did not know about the other five eyewitnesses, or that three of them had failed to pick Dennis' photo from the array. He therefore could not have challenged the line-up. The Commonwealth had still not completed discovery by the time of Dennis' preliminary hearing, held on December 23, 1991. So when the Commonwealth presented only the three eyewitnesses who had identified Dennis at the line-up—Howard, Bertha, and Cameron—defense counsel still did not know about the other witnesses who had not identified Dennis as the shooter.[7] Obviously, they were not called at the preliminary hearing to rebut the identifications made by the Commonwealth witnesses.

Police also failed to follow up on important leads. Although Howard told police that she had never seen the men who attacked Williams before, Williams' aunt and uncle, Diane and Mannasset Pugh, told police that Howard had told them only two days after the murder that she recognized the perpetrators from her high school, and that two people named "Kim" and "Quinton" had been there. 10/14/91 Act. Sheet, Pet'r's Br. Ex. 68. Another of Williams' aunts, Elaine Parker, also told police that Howard mentioned Kim and Quinton's presence, and had told her that the getaway car had been following Williams and her around for a whole week. Parker Stmt., Pet'r's Br. Ex. 58. However, police never asked Howard about her inconsistent

---

[7] *See supra* n.10.

statements—and never informed the defense of these comments.[8]

The police and prosecution also failed to turn over a series of documents relating to the statement of William Frazier with detailed, credible information about the murder—even though police turned over numerous other tips and statements relaying neighborhood rumors. Frazier, an inmate in the Montgomery County Jail, gave a statement first to the Montgomery Police and then to the Philadelphia police relaying a phone call he had had with two friends who told him that they and a third friend had committed the Williams murder. The statement included credible details, such as describing where on her body Williams had been shot and identifying Williams as "Kev's" girlfriend. Frazier Stmt., Pet'r's Br. Ex. 42. Frazier described the three men as all being taller than 5'7". Importantly, at least one of the men knew Howard from her high school; in this way, both Frazier's statement and Howard's statement to the Pughs corroborate each other—and neither were turned over to the defense. Police failed to investigate fully Frazier's claims, and the defense never learned of Frazier's statement until a decade after trial.

Improper police work characterized nearly the entirety of the investigation. On November 23, 1991, the same day that police arrested Dennis, they conducted searches of Dennis' mother's, father's, and girlfriend's homes. The search warrant receipt indicates that police seized two black waist-length jackets, one pair of red pants, and one pair of white sneakers. Search Warrant, Pet'r's Br. Ex. 94. Although many witnesses mentioned that the shooter was wearing a red sweat suit, the receipt does not note the size of the clothes or what they were made of, and the clothing was lost before any photographs or even a full cataloguing of the items were taken. At the

---

[8] After speaking with the Pughs, police wrote in their "THINGS TO DO" list that they intended to interview Howard about the statements. 10/14/19 Act. Sheet, Pet'r's Br. Ex. 68. However, when they met with Howard the following day, they did not ask her about the statements, instead asking her only to look at a photo array. Howard Stmt., Pet'r's Br. Ex. 45.

motion to suppress hearing held before trial, Assistant District Attorney Roger King[9] told the court that "the articles are misplaced or mislaid. We do not have them physically in our custody." NT 9/21/91 at 122.[10] The clothing was never found before trial. However, the lead detective testified at trial that the jackets seized "fit the description of the jackets worn by the perpetrator of the homicide," that "they were the size of the defendant," and that Dennis' father told detectives that the jackets belonged to Dennis. NT 10/15/92 at 4. Without any catalogued descriptions of the items, Dennis' lawyer was unable to counter the detective's assertions. This clothing was among the only physical evidence even discussed at trial. Police never found a gun, ammunition, or Williams' earrings.[11]

The jury also never heard about an important document that could have significantly buttressed Dennis' alibi. Dennis had told police that he saw a neighborhood acquaintance, Latanya Cason, on the K bus the afternoon of the murder. He said he waved to her when they got off the bus,[12] sometime between 2:15 and 2:30 p.m. NT 10/14/92 at 76-78. When the police interviewed Cason, she corroborated Dennis' story: She said she took the K bus, that she saw Dennis when she got off the bus, and that she waved. 1992 Cason Stmt., Pet'r's Br. Ex. 33. The only discrepancy was what time this interaction took place. Dennis testified that he boarded the 1:56 p.m. bus—right at the time the murder occurred. Therefore, if Cason—a disinterested witness with no motive to lie—testified that she saw him at 2:15 or 2:30 p.m., the scheduled

---

[9] By 1995, King had secured more death convictions than any district attorney in Pennsylvania history. Joseph R. Daughen, *He's 'Simply the Best'*, PHILA. DAILY NEWS, March 6, 1995, *available at* http://articles.philly.com/1995-03-06/news/25701152_1_death-sentences-death-row-robbery-murder.

[10] A decade after the trial, during the PCRA hearing, the lead detective testified that cleaners "threw [the clothing] in the trash." PCRA Evid. Hrg. NT 5/6/05 at 132 (testimony of Detective Jastrzembski).

[11] The Commonwealth proved that the earrings were stolen—providing the basis for felony murder, which in turn provided the basis for the death penalty—by having Howard testify that Williams had been wearing earrings that day. NT 10/5/92 at 16. It also presented testimony from Williams' mother saying that Williams was wearing earrings the morning of her murder. NT 10/8.92 at 50.

[12] 1991 Dennis Stmt., Pet'r's Br. Ex. 37.

arrival time of the 1:56 p.m. bus to Abbotsford Homes, her testimony would have significantly

bolstered Dennis' defense that he was at another place when the shooting occurred.

Cason, however, testified that their interaction occurred much later, between 4 and 4:30

p.m. NT 10/8/92 at 138. She explained that she left work around 2 p.m., took the subway to

North Philadelphia, picked up her welfare assistance check from "the 3-2 center," filled a

prescription, ordered some fish, went to a few other stores, returned to pick up the fish, and then

took the K bus home. *Id*. Only at that point did she see Dennis. She said that she could not have

seen Dennis at 2 p.m. because she was just getting off work then. *Id*. at 139.

However, after trial, Dennis' appellate counsel discovered Cason's receipt from the

Department of Public Welfare ("DPW") center, showing that she picked up her welfare check at

1:03 p.m., which was noted in military time as 13:03 p.m. If Cason picked up her check at 1:03

p.m., she could not have been working until 2 p.m. When shown this receipt, Cason provided an

affidavit to appellate counsel. She stated that the police had a copy of this receipt when they

came to interview her, and that she had provided police with her only copy. She explained that

she "may have thought that the 13:03, which is on the receipt, was 3:03." 1997 Cason Aff.,

Pet'r's Br. Ex. 34. She further stated that if she cashed the check at 1:03 as the receipt indicated,

she would have seen Dennis "between 2 and 2:30 p.m. at the Abbotsford Homes, and not 4:00 to

4:30 that is in my statement." *Id*.

Cason's trial testimony cast serious doubt on Dennis' explanation of his whereabouts on

the day of the murder. Armed with the correct time of her check transaction, Cason could have

been a powerful alibi witness for Dennis. As it stands now, her corrected timeline of the

afternoon, in which she believes she did see Dennis between 2:15 and 2:30, throws Dennis' guilt

into serious question.

Beyond the problems with the investigation and prosecution of this crime, there were significant flaws with defense counsel's investigation and trial preparation as well. Most glaringly, Dennis' trial counsel never interviewed a single eyewitness.[13] As a result, he never learned from eyewitness Ritchie that he had not picked Dennis out of a photo array, or that the detectives grew increasingly frustrated by this failure to identify Dennis. Despite receiving Ritchie's police statement, in which he described the shooter as 5'9" and 170 pounds, and told the police that the shooter "looked right dead in my face" and that he "sure would" recognize the men involved, Dennis' trial counsel never asked him to look at a photo array or attend a line-up. Further, although trial counsel was present at the line-up when eyewitness Anthony Overstreet picked another person, not Dennis, as the shooter, Overstreet was never interviewed by the lawyer, let alone called to testify at trial. As a result, the jury never heard that this eyewitness— who had the exact same vantage point as one of the Commonwealth's central witnesses, Thomas Bertha—did not think Dennis was the shooter.[14]

Dennis' trial counsel also missed a crucial opportunity to impeach the only witness who claimed to have seen Dennis with a gun the night of the murder. Charles "Pop" Thompson, a member of Dennis' singing group, testified that he saw Dennis with a gun matching the description of the murder weapon. The gun used in the murder was never recovered, and there was no other evidence linking Dennis to the weapon; indeed, Dennis testified that he did not possess a gun of any kind. Thompson therefore provided crucial testimony for the prosecution.

---

[13] It was standard practice at the time of Dennis' trial for defense counsel in major felony crimes to interview eyewitnesses directly. "This is *the* most basic part of pre-trial preparation, and essentially required of any competent trial counsel." Brief for the Atlantic Center for Capital Representation, et. al. as *Amici Curiae* 9 (hereinafter "ACCR Brief").

[14] The officer who conducted the lineup testified for the Commonwealth at trial, but the court ruled that Dennis' lawyer could not ask him about Overstreet's identification of someone besides Dennis unless Overstreet himself took the stand. NT 10/8/92 at 97. Trial counsel never called Overstreet, and so the jury never heard about his misidentification.

Had he investigated Thompson, Dennis' trial counsel would have discovered that Thompson first told police about seeing Dennis with a weapon when he was under arrest for a violent assault of his pregnant girlfriend that left her in the hospital.[15] Six months after Thompson gave police this statement claiming to have seen Dennis with a gun, the Commonwealth dropped the felony assault charges, without explanation. When Thompson testified at trial, Dennis' counsel could not question him about his possible motive to lie, because he never investigated Thompson's criminal history and never discovered the dropped charges. The jury therefore never heard information that could have significantly discredited Thompson's testimony.

Overall, Dennis' lawyer provided only a bare minimum defense. As stated above, he never interviewed or investigated a single eyewitness. He spent no more than 10 or 15 minutes with Dennis' alibi witnesses, often just before their testimony, and made no effort to find documentary support, such as the SEPTA bus schedule, to buttress Dennis' alibi. Though there was only minimal physical evidence in the case—a button with blood on it; the victim's clothes, necklace, and artificial fingernails; and the bullet—Dennis' lawyer failed to test any of it. Nor did he consult or retain any experts, despite the fact that the Commonwealth called two experts, a medical examiner and a ballistics expert, to testify. During the penalty phase, counsel presented very little mitigation. He requested no medical records or school records, and conducted no independent investigation, relying instead solely on Dennis and his family.

The jury deliberated for fewer than 5 hours before returning a conviction against Dennis. The presentation of evidence in penalty phase was completed in just over three hours.[16] Although

---

[15] "[E]ven the most basic level of trial preparation would have required defense counsel to check the criminal records of prosecution witnesses. . . . Obtaining such records was a routine part of any defense counsel's pre-trial investigation." ACCR Brief at 10.

[16] Before trial, the Commonwealth offered to drop its pursuit of the death penalty in exchange for a guilty plea and

the court directed the jury to find, as a matter of law, the mitigating circumstance that Dennis had no significant criminal history,[17] the jury returned a verdict of death—after just 90 minutes of deliberation—without finding that mitigating factor. When the court sent the jurors back to correct the verdict sheet, they "deliberated" for another three minutes, before returning to the courtroom with the sheet filled out as instructed.

Given the circumstances of the investigation and trial, as described above, one cannot but harbor strong doubt as to Dennis' guilt. The Commonwealth of Pennsylvania has committed a grave miscarriage of justice in convicting Dennis and sentencing him to die for this crime.

## II.     PROCEDURAL HISTORY

- In October 1992, Dennis was convicted of first-degree murder, robbery, and related charges in the Philadelphia County Court of Common Pleas, and sentenced to death.

- On July 22, 1998, the Pennsylvania Supreme Court (4-3) affirmed Dennis' conviction and death sentence on direct appeal. *Commonwealth v. Dennis*, 715 A.2d 404 (Pa. 1998) ("*Dennis I*").

- On September 15, 1998, Dennis filed a timely *pro se* petition pursuant to the Post Conviction Relief Act (PCRA). In December 1999**,** PCRA counsel was appointed and filed an amended petition, and, subsequently, a supplemental amended petition and a second supplemental petition on Dec. 1, 2000, and July 10, 2002, respectively.

- On December 12, 2000, Dennis filed a motion for discovery, seeking the jury selection notes of the prosecutor. Following briefing and oral argument, the PCRA court granted the Motion to Compel Discovery of the *voir dire* notes. After granting the Commonwealth's request for reconsideration of the order, the PCRA court reinstated the discovery order on July 10, 2001.

- On October 21, 2004, the Pennsylvania Supreme Court reversed the order granting discovery of prosecutor's jury selection notes, finding that the *Batson v. Kentucky,* 476 U.S. 79 (1986) claim had been previously litigated. The Court remanded the case for

---

testimony against the two other men involved in the murder. Dennis refused. NT 9/22/91 at 53-55. Obviously, if Dennis was not at the scene of the crime, he would be unable to identify the actors.

[17] Dennis had one conviction for possession of a controlled substance.

completion of PCRA review. *Commonwealth v. Dennis, 859 A.2d 1270* (Pa. 2004) ("*Dennis II*").

- In May 2005, the PCRA court conducted several days of evidentiary hearings, and then subsequently denied Dennis' claims for relief and dismissed his PCRA petition on September 15, 2005. *Commonwealth v. Dennis*, Case No. 92-01-0484, slip op. (Pa. Ct. Com. Pl. Nov. 17, 2005).

- On June 20, 2008, the Pennsylvania Supreme Court affirmed in part and vacated in part, remanding two claims to the PCRA court. *Commonwealth v. Dennis*, 950 A.2d 945 (Pa. 2008) ("*Dennis III*"). The Pennsylvania Supreme Court remanded two claims to the PCRA court for further review: (i) Dennis' claim that trial counsel was ineffective for failing to investigate potential alibi witness Anissa Bane; and (ii) Dennis' claims that the Commonwealth suppressed material exculpatory evidence in violation of Brady, namely, the contents of the police activity sheet in which the Pughs allegedly provided information that could potentially impeach the testimony of eyewitness Zahra Howard.

- On March 17, 2010, after evidentiary hearings on remand, the PCRA court again dismissed Dennis' petition. *Commonwealth v. Dennis*, Case No. 92-01-0484, slip op. (Pa. Ct. Com. Pl. Mar. 17, 2010).

- On May 13, 2010, Dennis appealed the dismissal.

- On Jan. 18, 2011, the Pennsylvania Supreme Court affirmed the PCRA denial. *Commonwealth v. Dennis*, 17 A.3d 297 (Pa. 2011) ("*Dennis IV*").

- On March 8, 2011, Dennis filed a § 2254 habeas corpus petition to review his conviction and death sentence.

## III.    LEGAL STANDARD

### A.  AEDPA

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a habeas court may not grant relief with respect to any claim adjudicated on the merits by the state courts unless the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

12

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Third Circuit has interpreted these statutory provisions as a three-step inquiry, looking first to the "contrary to" clause, second to the "unreasonable application" clause, and finally to the "unreasonable determination of the facts" clause. *Blystone v. Horn*, 664 F.3d 397, 417 (3d Cir. 2011). For these purposes, "clearly established federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A state court decision is contrary to clearly established federal law under the first clause of § 2254(d)(1) when the state court (1) "arrives at a conclusion opposite to that reached by this Court," or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that precedent]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). In either of these scenarios, because the state court decision is contrary to federal law, the federal court has de novo review over the state court decision. *Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013). When the state court correctly identifies the governing federal precedent but applies it in a debatable manner, the "contrary to" clause is not violated. *Williams v. Taylor*, 529 U.S. at 405-06.

A state court decision is an unreasonable application of clearly established federal law when the state court "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The habeas petitioner must show that the state court decision was objectively unreasonable and not merely incorrect. *Id.* at 410-411; *Blystone*, 664 F.3d at 417. "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," the state court's application of federal law cannot be considered

unreasonable. *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington*, 131 S. Ct. at 786-87 (citations omitted). In other words, habeas review is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id*. at 787 (internal quotation marks omitted).

Finally, a federal court may grant habeas relief where the state court decision constitutes an unreasonable determination of the facts in light of the evidence presented to the state court. In considering whether the state court's decision satisfies that deferential standard, "a determination of a factual issue made by a State court shall be presumed to be correct." § 2254(e)(1). To assess the reasonableness of a state court's determination of the facts, a federal court must determine whether the state court's factual findings are supported by sufficient evidence. *See Miller-El v. Cockrell*, 537 U.S. 322, 340-41 (2003); *Beck v. Bowersox*, 257 F.3d 900, 901 (8th Cir. 2001) (§ 2254(d)(2) and (e)(1) "require meaningful federal court review of the evidentiary record considered by the state courts"). Of course, "deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller-El*, 537 U.S. at 340.

All three of these § 2254(d) inquiries—whether the state court's decision was contrary to

federal law, an unreasonable application of federal law, or based on an unreasonable determination of the facts—apply only when the petitioner's federal claim has been "adjudicated on the merits in State court proceedings." If a claim has not been adjudicated on the merits, a federal court will apply de novo review to pure legal questions and to mixed questions of law and fact. *Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009).[18]

### B. *Brady v. Maryland*

The Due Process Clause imposes upon the prosecution an "affirmative duty" to disclose evidence to the accused that is favorable to the defense and material to guilt or punishment. *Brady*, 373 U.S. at 87; *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (noting the prosecution's "affirmative duty"). To mount a successful *Brady* claim, the petitioner must establish three essential elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (internal quotation marks omitted). Prejudice, also referred to as "materiality," is established when the petitioner shows "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (internal quotation marks omitted).

*Kyles* made three important points about materiality that are relevant here. First,

a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

---

[18] There is no dispute that the *Brady* claim at issue here was exhausted in state proceedings and decided on the merits by the Pennsylvania Supreme Court.

*Id*. at 434 (internal quotation marks omitted). Second, the question of materiality "is not a sufficiency of evidence test." *Id*. It is incorrect to assume that a petitioner must lose on his *Brady* claim where there still would have been adequate evidence to convict even if the favorable evidence at issue had been disclosed: "The rule is clear, and none of the *Brady* cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone." *Id*. at 435 n.8. Finally, the materiality of *Brady* evidence must be "considered collectively, not item by item." *Id*. at 436. "While the definition of *Bagley* materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden." *Id*. at 437. The *Kyles* Court further emphasized that the prosecution "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id*.

## IV.    DISCUSSION

Dennis argues that the Commonwealth failed to turn over three categories of exculpatory or impeaching evidence, in violation of *Brady* and its progeny. First, the Commonwealth failed to disclose numerous statements implicating three other men in the murder, none of whom had any relationship to Dennis. Because these documents stem from statements provided to the police by a man named William Frazier, I will refer to them as the Frazier documents. Second, the Commonwealth failed to turn over a receipt that showed the time Latanya Cason picked up her welfare assistance payment on the day of the murder, significantly altering her estimation of when she saw Dennis on the bus and thereby corroborating his alibi. Finally, the Commonwealth failed to disclose a police activity sheet suggesting that Zahra Howard, a crucial eyewitness, said that she recognized the shooter from her high school. I will examine these pieces of evidence in

turn, before examining the potential collective prejudice resulting from their withholding.[19]

### A. The Frazier Documents

On November 1, 1991, just ten days after Williams' murder and more than three weeks before police arrested Dennis, William Frazier, an inmate at the Montgomery County jail, gave police a signed statement about the murder. In that statement, Frazier related that on October 30, 1991, he called his friend Tony Brown from jail, with the assistance of his aunt. Brown immediately told Frazier that Brown, Frazier's cousin Ricky Walker, and another friend called "Skeet" had "fucked up." Walker then got on the phone but refused to tell Frazier what they had done. When Brown returned to the phone, he asked Frazier if he heard about "the incident on the news about the girl that [was] killed over a pair of earrings," and said, "that was us." Frazier Stmt., Pet'r's Br. Ex. 42. Brown told Frazier that he and Walker approached Williams while Skeet stayed in the car. When she refused to give up her earrings, Brown told Frazier he put the gun to her neck, and that it "accidentally went off." According to Frazier's statement, Brown said that the three men climbed through a window at Frazier's apartment and stayed there for a couple of days. Then Walker got on the phone and told Frazier that they were scared, and that he was only leaving the apartment in the middle of the night so that no one would see him.

Frazier told the police that he knew Brown committed robberies, and that he "always had a gun" and owned "a collection of guns." He also said that Brown owned a brown Oldsmobile, and that Brown told him they had used his car. He said both Brown and Walker sounded "extremely nervous and upset." Frazier also told police that Brown indicated he knew who the

---

[19] The Petition also raises a *Brady* claim with respect to a fourth piece of evidence. Dennis claims that the witness who testified that he saw Dennis with a gun on the night of the murder, Charles Thompson, tried to recant his testimony on the eve of trial, and that the District Attorney never told the defense of that fact. However, there is no evidence that the District Attorney knew that the witness tried to recant, or even that the witness did in fact actually try to recant. This claim has no merit.

victim was. Brown allegedly asked Frazier if he remembered "Kev with the blue pathfinder," and said the victim was "his [Kev's] girl."[20]

Frazier told police about the pawn shop where the three men were likely to have sold the earrings. He also provided physical descriptions of the men, and noted that Brown "likes to wear sweat suits." Frazier then accompanied the police on a ride-along during which he pointed out various relevant locations, including the pawn shop he mentioned and the homes of Brown and Walker, and Skeet's former address.

Following up on Frazier's statement, the Philadelphia police visited Frazier's apartment. The landlord confirmed that he rented the apartment to Frazier, but stated that no one had been in the residence since Frazier had been arrested. *See* 11/1/91 Act. Sheet, Pet'r's Br. Ex. 72. The following day, the police interviewed Ricky Walker, who denied having ever been to Frazier's house, knowing Tony Brown, or having any involvement in Williams' murder. *See* Walker Stmt., Pet'r's Br. Ex. 65. Walker told police that at the time of the murder, he was at his house with his mother, but police never followed up to confirm that alibi.

In all, the Commonwealth suppressed six documents related to Frazier's statement:

- Frazier's initial statement to Montgomery County police (Oct. 31, 1991)
- Frazier's statement to the Philadelphia police (Nov. 1, 1991)
- Police Activity Sheet re: Frazier's landlord (Nov. 1, 1991)
- Police Activity Sheet re: Ricky Walker (Nov. 2, 1991)
- Frazier's signed search consent (Nov. 1, 1991)
- Ricky Walker statement (Nov. 2, 1991)[21]

The Commonwealth does not dispute that these documents were only disclosed to Dennis for the first time during Dennis' PCRA proceedings, in January 2002, a decade after Dennis' trial.

---

[20] Walter A. Gillyard Jr. told police that he was Chedell Williams' former boyfriend, and that Chedell used to "go with" Kevin Williams before she dated Gillyard. Gillyard Stmt., Pet'r's Br. Ex. 43.

[21] The documents can be found, respectively, in Pet'r's Br. Exs. 86, 42, 72, 73, 82, 65.

1. **State Court Decision**

Dennis used the documents to raise a *Brady* claim in the 2002 Supplement to his PCRA petition. The claim is therefore fully exhausted. The PCRA court failed entirely to address the *Brady* claim in its decision denying relief, but the Pennsylvania Supreme Court, on appeal of the PCRA decision, rejected the claim on the merits. *Commonwealth v. Dennis*, 950 A.2d 945, 966-68 (Pa. 2008) ("*Dennis III*"). The court determined that Dennis had failed to distinguish his claim from *Commonwealth v. Lambert*, 884 A.2d 848 (Pa. 2005), and cited *Lambert*'s two main holdings: (1) that the prosecution need not disclose "every fruitless lead followed by investigators of a crime"; and (2) that "inadmissible evidence cannot be the basis for a *Brady* violation." *Lambert*, 884 at 857. The Pennsylvania Supreme Court relied on these same points to reject Dennis' *Brady* claim: "In the absence of any argument regarding the gravamen of *Lambert* . . . Petitioner has failed to establish a basis for relief with regard to this evidence." *Dennis III* at 968.

2. **AEDPA Analysis**

Because the state supreme court reached the issue on the merits, Dennis may obtain habeas relief only if he can show that the decision was an unreasonable application of clearly established federal law.[22] I find that the state court's holding constitutes an unreasonable application of *Brady* and its progeny. In short, there is nothing in *Brady* to suggest such a narrow reading of the prosecution's affirmative disclosure obligations. The Supreme Court has made it clear that *Brady*'s obligations are broad, and cannot be so easily avoided as the state court determined.

As explained above, a defendant raising a *Brady* claim must establish three elements: (1)

---

[22] The decision was not contrary to clearly established federal law, because it cited and applied the correct legal standard for *Brady* claims.

the information was favorable to the defendant, either as exculpation or impeachment; (2) the information was suppressed by the government; and (3) prejudice resulted, meaning that there is a reasonable probability of a different result, had the information been disclosed. *Dretke*, 540 U.S. at 691. Here, there is no question that the first two elements are met. The state court opinion found that the evidence was not "material," or prejudicial, under *Brady* because neither a "fruitless lead" nor inadmissible evidence, had it been disclosed, could have with reasonably probability affected the outcome of Dennis' trial. Both conclusions are an unreasonable application of federal law.

The assertion—that inadmissible evidence cannot be the basis of a *Brady* claim—can be quickly rejected. The United States Supreme Court has never stated such a rule, and most circuit courts, including the Third Circuit, have held the opposite. In its recent opinion in *Johnson v. Folino*, 705 F.3d 117 (3d Cir. 2013), the Third Circuit made it clear that admissibility is not the touchstone of materiality under *Brady*:

> Rather, we believe, as do the majority of our sister courts of appeals, that inadmissible evidence may be material if it could have led to the discovery of admissible evidence. Furthermore, like the Court of Appeals for the Second Circuit, we think that inadmissible evidence may be material if it could have been used effectively to impeach or corral witnesses during cross-examination. Thus, the admissibility of the evidence itself is not dispositive for Brady purposes. Rather, the inquiry is whether the undisclosed evidence is admissible itself or could have led to the discovery of admissible evidence that could have made a difference in the outcome of the trial sufficient to establish a "reasonable probability" of a different result.

*Id.* at 130 (citations omitted).

Moreover, not only has the United States Supreme Court never stated that inadmissible evidence cannot be material under *Brady*, its holding in *Wood v. Bartholomew*, 516 U.S. 1 (1995)—the only federal case the *Lambert* court cited for support of this contention—strongly implies just the opposite: that inadmissible evidence can indeed be material under *Brady*. In

*Wood*, the Court denied the petitioner's *Brady* claim that the prosecution improperly withheld certain polygraph test results. The test results were clearly inadmissible under state law. If inadmissible evidence could never form the basis of a *Brady* claim, the Court's examination of the issue would have ended when it noted that the test results were inadmissible. However, the Court never focused on the admissibility of the evidence but instead analyzed the *effect* of its suppression, and found that the petitioner did not suffer prejudice:

> In short, it is not "reasonably likely" that disclosure of the polygraph results—inadmissible under state law—would have resulted in a different outcome at trial. Even without Rodney's testimony, the case against respondent was overwhelming. To acquit of aggravated murder, the jury would have had to believe that respondent's single action revolver discharged accidently, not once but twice, by tragic coincidence depositing a bullet to the back of the victim's head, execution style, as the victim lay face down on the floor. In the face of this physical evidence, as well as Rodney and Tracy's testimony—to say nothing of the testimony by Bell that the State likely could introduce on retrial—it should take more than supposition on the weak premises offered by respondent to undermine a court's confidence in the outcome.

*Wood*, 516 U.S. at 8. The *Wood* decision makes it clear that there is no admissibility requirement for *Brady* evidence. Moreover, as explained below, the statement could have led to the discovery of admissible evidence, rendering its own admissibility irrelevant for purposes of *Brady*. *See Johnson*, 705 F.3d at 130. The Pennsylvania Supreme Court's holding that inadmissible evidence cannot form the basis of a *Brady* claim is therefore an unreasonable application of federal law.

As to the *Dennis III* court's second point, that Frazier's statement was merely a "fruitless lead" that was not material under *Brady*, the court's narrow interpretation of *Brady* materiality was an unreasonable application of *Brady* and its progeny, notably *Kyles*. While it is unquestionably true that the prosecution need not maintain an "open file" policy with the defense, *see Kyles*, 514 U.S. at 437, the Frazier documents cannot be passed off as merely a "fruitless lead" that the prosecution was entitled to keep to itself. There is simply no comparison

between the credible, important Frazier statement and the statement at issue in *Lambert*, upon which the Pennsylvania Supreme Court relied in denying Dennis' claim. *Lambert* centered around a robbery and murder of a bartender, in which a witness admitted to being the getaway driver and claimed that the defendant, James Lambert, was the shooter. Lambert argued that he was not there, and that the witness and another man did the robbery. In his post-conviction appeal, Lambert made a *Brady* claim based on a police activity sheet indicating that an individual told police that his brother had told him that two other men had bought a gun and planned to rob a bar. The Pennsylvania Supreme Court rejected this claim in a single paragraph, calling this statement a meaningless fruitless lead that need not be handed over to the defense. *Lambert*, 884 A.2d at 857. The worthlessness of that statement was clear given the witness' admission that he participated as the getaway driver: The police had good reason to dismiss as incredible a statement from another individual suggesting that two other men may have been involved.

By contrast, Frazier's statement contains internal markers of credibility, such as Brown's purported description of the victim as "Kev's girl," when in fact Williams had dated a boy named Kevin,[23] and Brown's purported admission to shooting the victim in the neck, the same location as Williams' fatal wound. More importantly, Frazier's statement pointed to three men who matched the eyewitness descriptions of the perpetrators more closely than Dennis did. Walker was described as 5'8" tall, Brown was described at 5'7" tall, and Skeet was described as "taller than all of us." By contrast, Dennis was measured at trial as 5'5" tall, with shoes on. Thus, the suspects Frazier described come much closer to the descriptions provided by the eyewitnesses. Frazier also told police that his aunt had been on the October 31, 1991 phone call with Brown and Walker; she would thus have been a disinterested third party who could have

---

[23] *See supra*, n.25.

lent additional credibility to Frazier's statement. All of these facts should have alerted the police and prosecution to the statement's potential value to Dennis.

Indeed, in assessing the materiality of undisclosed evidence, a court must consider "any adverse effect that the prosecutor's failure . . . [to disclose the evidence] might have had on the preparation or presentation of the defendant's case. . . . [w]ith an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken" had the information been disclosed to the defense. *Bagley*, 437 U.S. at 638 (opinion of Blackmun, J.). Here, regardless of whether Frazier's statement itself was admissible, its disclosure to the defense would have undoubtedly led to investigation that could have proved vital to the defense. The statement contained numerous details that could have been confirmed, and could have allowed Dennis to present a defense that someone else did the crime—a defense he was unable to pursue without this information and that would have buttressed his own defense of mistaken identity. Competent counsel would have launched an investigation stemming from these statements, including, for example, asking for a line-up or photo array with the three men named in the statement; showing photos of the men to the eyewitnesses; investigating the suspects' purported alibis; investigating the men's criminal backgrounds and reputations around the neighborhood; using the statement to cross-examine testifying officers about the likelihood that other men committed the crime; and, more generally, presenting a defense that someone else committed the crime.

The information could also have been used to impeach the adequacy of the police investigation. The Supreme Court, in *Kyles*, recognized the value of *Brady* evidence that could have been used by the defense when examining the police and "attack[ing] the reliability of the investigation." *Kyles*, 514 U.S. at 446. In *Kyles*, the defense could have used the information at

issue "to throw the reliability of the investigation into doubt and to sully the credibility" of the lead detective. *Id*. at 447. The same is true in Dennis' case. Armed with the Frazier documents, the defense could have attacked the reliability of the Philadelphia police's investigation. It could have pointed out the corroborating indicia of reliability in the statement, including pieces of evidence, such as the heights of Brown and Walker, that more closely matched the witness descriptions of the perpetrator than Dennis. An effective defense presentation would have inquired of the police why they failed to verify Walker's alibi, or follow up with Brown. It would have asked why the police dropped a promising lead that pointed to three suspects—the number of men who actually participated in the crime—to focus in on a man with no serious criminal history, without any theory of who his accomplices were.

> [W]hile the knowledge the police were investigating [another suspect] would arguably carry significant weight with the jury in and of itself, that fact would also have been useful in discredit[ing] the caliber of the investigation or the decision to charge the defendant, factors we may consider is assessing whether a *Brady* violation occurred.

*Smith v. Sec'y of New Mexico Dep't of Corr*., 50 F.3d 801, 830 (10th Cir. 1995) (internal quotation marks omitted). To a defendant arguing mistaken identity and innocence, attacking the police's investigation is crucial.

The police's paltry investigation of the Frazier statement further undercuts the Pennsylvania Supreme Court's argument that the documents amounted to no more than a "fruitless lead." As Dennis points out, the primary reason it was "fruitless" was that detectives simply ceased to investigate the matter. Instead, detectives ignored promising, credible leads and simply accepted Walker's word that he was not the perpetrator, and let the matter drop. Moreover, the fact that police did turn over several other statements showing leads to possible

suspects,[24] but notably left out only the Frazier documents, adds further weight to the supposition that the police recognized a risk in disclosing this material to the defense.

The state court opinion thus rested on faulty reasoning. First, its holding that inadmissible evidence can never be the basis for a *Brady* claim is a patently unreasonable application of *Brady* and *Wood*. Second, its unexplained conclusion that the Frazier statement amounted to nothing more than a "fruitless lead" and thus was immaterial has no support in the facts, and constitutes an unreasonable application of federal law. Supreme Court precedent makes it clear that *Brady* evidence is material where it significantly impacts the preparation of the defense, as well as when it can help the defense impeach the reliability of the state's investigation. The Frazier documents would have provided central and unique evidence of other suspects that the defense could have investigated and used to present an argument that other men committed the crime—a defense that was not available to them to pursue without this evidence. In addition, the Frazier documents would have allowed the defense to call into significant question the adequacy of the police's investigation, and present powerful evidence to the jury that the paltry and unsupported work of the police led the Commonwealth to prosecute the wrong man. This evidence was unquestionably material, and its suppression seriously undermines the fairness of trial Dennis received. Because the Commonwealth's underhanded and illegal tactics violated Dennis' due process rights, he is entitled to a new trial.

### B. Cason Receipt

Dennis' next *Brady* claim rests on the Commonwealth's non-disclosure of a receipt from the Department of Public Welfare signed by Latanya Cason. The receipt is time-stamped as

---

[24] For example, the Commonwealth turned over a police record in which a witness implicated Rodney McCleary and David Hardimon in the killing. Pet'r's Br. Ex. 30. It turned over a police document relaying a tip from Miriam Dangerfield that "Abdul" had killed Williams. *Id.* at Ex. 50. It turned over a statement that described an earlier robbery of Williams by "Pep." *Id.* at 43.

"13:03" and shows a $94.00 payment for "public assistance" made on "91-10-22." In other words, it shows that Cason picked up her welfare payment around 1 p.m. on October 22, 1991, the day of Williams' murder. Cason testified at trial that she picked up her welfare assistance that day, and saw Dennis on the bus sometime after that. *See* NT 10/22/92 at 148. The defense never saw this receipt at trial.

On April 2, 1997, while Dennis' direct appeal was pending, Cason executed a notarized affidavit regarding her 1992 interview with the police, when the police arrived at her home to ask her whether she saw Dennis the day of the murder. She explained in the affidavit that the police brought with it a receipt from the DPW with her signature, showing that she cashed her welfare check on October 22, 1991; the police also brought other papers showing that she went to her job that day as well. Although the police had its own copy, Cason stated that she "located and gave the detective my pink copy of the same receipt. The detective kept my copy of the receipt." 1997 Cason Aff., Pet'r's Br. Ex. 34.

At Dennis' trial, Cason testified that she left work around 2 p.m., picked up her welfare assistance, ran other errands, and then saw Dennis on the bus "between 4:00 and 4:30, something like that." NT 10/8/92 at 138. The receipt is important because it shows that Cason in fact picked up her welfare check at 1:03 p.m., not sometime after 3 p.m., as she testified at trial. *See id.* at 152. It further demonstrates that she did not, in fact, work until 2 p.m., as she testified. In her affidavit, she explained that when she gave her statement to the police, she did not remember exactly what time she left work, and that she "may have thought that the 13:03, which is on the receipt, was 3:03 p.m." 1997 Cason Aff., Pet'r's Br. Ex. 34. She concluded that, given the actual timestamp on the receipt, "I would have seen James Dennis between 2 and 2:30 p.m. at the Abbotsford Homes, and not 4:00 to 4:30 that is in my statement." *Id.* In other words, armed with

the time-stamped receipt, Cason would have testified that—just as Dennis claimed—she did in fact see him on the bus sometime around 2:30, significantly corroborating his testimony that he boarded the bus at his father's house at the time of the murder.

Dennis claims that the receipt is exculpatory, was suppressed by the Commonwealth, and is material. He further argues that the Pennsylvania Supreme Court opinion rejecting this *Brady* claim was both an unreasonable determination of the facts and an unreasonable application of *Brady* and its progeny.

**1. State Court Opinion**

Dennis presented this claim on direct appeal. Though the claim was primarily presented as an ineffective assistance of counsel claim, Dennis included a paragraph pointing to Cason's affidavit and arguing that the Commonwealth's withholding of the receipt from the defense amounted to a *Brady* violation. In response, the Commonwealth first denied the *Brady* claim by insisting the receipt had been introduced at trial. 1997 Appellee Br., Pet'r's Br. Ex. 4. This was a misleading, if not false, argument: The Commonwealth had introduced an entirely different document, a "Schedule of Payment and Food Stamp Authorization Card." *See* NT 10/8/92 at 139-40 (Cason explaining the exhibit as "a card saying when we go pick up our public assistance checks and food stamps").[25] Second, the Commonwealth complained that Dennis insufficiently explained what the receipt showed; there was no telling, it said, whether the timestamp reflected the time Cason entered the DPW center or the time she actually received the check. This argument is a red herring: Even if it shows what time she entered the center, it would prove her testimony that she worked until 2 p.m. false. For that reason alone, it was relevant. In addition, she told police that she only waited in line at the DPW center for 15 to 20 minutes. 1992 Cason

---

[25] The Commonwealth abandoned that argument—that the receipt had actually been introduced into evidence—in its reply briefing and during these federal habeas proceedings.

Stmt., Pet'r's Br. Ex. 33. Therefore, it was highly relevant whether it showed her entering the DPW center at 1:03 p.m. *or* receiving her payment at 1:03 p.m.

Next, the Commonwealth argued that the receipt does not prove that Dennis was not the shooter, and that Cason's "corrected" testimony would have been merely cumulative of another witness, Willis Meredith, who testified that he saw Dennis at the Abbotsford Homes around 2:30 p.m. *See* NT 10/13/92 at 50-51. Finally, the Commonwealth argued to the state court that it could not have suppressed the document because its "file does not contain a copy of that document, even though Cason claims in her affidavit that it was taken by the police." 1998 Resp. to Def's Br. 4, Pet'r's Br. Ex. 5.

The Pennsylvania Supreme Court rejected both the ineffective assistance claim and its accompanying *Brady* claim, in a brief three-paragraph discussion. It summarily dismissed the *Brady* claim: "The DPW receipt was not exculpatory, because it had no bearing on Appellant's alibi, and there is no evidence that the Commonwealth withheld the receipt from the defense." *Commonwealth v. Dennis*, 715 A.2d 404, 408 (Pa. 1998) ("*Dennis I*"). The opinion therefore explicitly addressed the first two prongs of *Brady*. It also implicitly addressed the materiality prong when it denied the accompanying ineffective assistance claim for lack of prejudice: Even if Cason "had seen Appellant at the Abbottsford [*sic*] Homes at 2:30 p.m., her testimony would not have supported Appellant's alibi, because the murder occurred at 1:50 p.m., forty minutes earlier than Cason's earliest estimate." *Id*. As a result, AEDPA deference applies to all three aspects of the *Brady* claim.

## 2. AEDPA Analysis

The Pennsylvania Supreme Court decision provides no bar to habeas relief, because it was both an unreasonable determination of the facts as well as an unreasonable application of

federal law. Given the paltry discussion by the state court, I will examine both its stated explanations and the arguments the Commonwealth presented to it when analyzing the reasonableness of the state court's decision.

### a. The receipt was favorable to the defense.

The Cason receipt unquestionably meets *Brady*'s first prong. As explained above, evidence that is favorable to the defendant—including impeachment evidence—satisfies the first prong. *See Dretke,* 540 U.S. at 691; *Bagley*, 473 U.S. 667 (the disclosure obligations under *Brady* apply to impeachment evidence). The time-stamped receipt was unquestionably favorable to the defense. Entirely separate from the receipt's potential corroboration of Dennis' alibi, it would have provided direct evidence that Cason's testimony was false and thus would have been strong impeachment evidence. Armed with the receipt, Dennis' counsel—at the very least— would have been able to show that Cason was mistaken about the timing of the afternoon, by pointing out that she could not possibly have worked until 2 p.m. since she was at the DPW center at 1:03 p.m. Indeed, one can easily imagine the crucial assistance the receipt would have provided by examining what actually occurred during trial. On cross-examination, the defense tried to suggest that Cason may have seen Dennis earlier than she thought. The Commonwealth shut this argument down on redirect:

> Q: Miss Cason, did you see James Dennis at Henry and MC Michael [*sic*] at around 2:00 on the day that Chedell Williams was killed? […]
> A: It couldn't have been. Like I said, I ain't get off work till two.

NT 10/8/92 at 151. The time-stamped receipt would have directly contradicted this testimony. Without question, then, the receipt was favorable to the defense. The state court's determination that the receipt was not "exculpatory" was an unreasonable determination of the facts.

**b. The Commonwealth improperly suppressed the receipt.**

Similarly, the Pennsylvania Supreme Court's declaration that there was "no evidence that the Commonwealth withheld the receipt from the defense" was an unreasonable determination of the facts. *Dennis I* at 408. Indeed, the court itself, just two paragraphs above this conclusion, stated that "the police came into possession" of the receipt when interviewing Cason. *Id*. Notably, the Commonwealth has never asserted—either before the state courts or in its submissions before me—that it did, in fact, turn over the receipt to the defense. Rather, it simply claims that Cason's signed, notarized affidavit is not sufficient proof that she gave the receipt to the police. [26] This argument is unavailing, as notarized affidavits are competent evidence on both direct appeal and in habeas proceedings.

In its most brazen argument, the Commonwealth told the state court that there was insufficient evidence it had suppressed the receipt because "the Commonwealth's file does not contain a copy of that document." 1998 Resp. to Def's Br. 4, Pet'r's Br. Ex. 5. Similarly, in its briefing before me, the Commonwealth argues that "there is no credible evidence that the Commonwealth had Cason's DPW receipt in the first place." Commw. Resp. 43. This argument

---

[26] The Commonwealth argues that Cason's affidavit, as "a recantation of her trial testimony," is "presumptively unreliable." Commw. Resp. 43 (citing *Landano v. Rafferty*, 856 F.2d 569, 572 (3d Cir. 1988)). The Commonwealth insists that "[n]othing about her affidavit, or the receipt, suggests her account was reliable." This stretches the bounds of believability. The receipt's time-stamp *proves*, as a matter of fact, that her testimony that she worked until 2 p.m. was inaccurate. To dismiss her affidavit as incredible is to ignore the plain fact of the documentary evidence. This is not some change-of-heart recantation; rather, confronted with the timestamp showing what time she actually conducted her business at the DPW center, Cason revised her estimate of the timing of that day's happenings.

Indeed, Cason's revised account, in her affidavit, is in fact consistent with her suggestion at trial, on cross examination, that she was basing her time estimates on the series of errands she ran that afternoon:

> Q: . . . And your answer is, "I guess I was getting off the bus between 4:00 and 4:30." Do you see that?
> A: Yes.
> Q: You used the word "I guess" in there, indicating perhaps there was some question in your mind as to what time it was. Was that time of 4:00 or 4:30 strictly a guess on your part?
> A: Yes. I don't know exactly what time. Like I said, *I did a couple things before that.* You know. I got on the bus.

NT 10/8/92 at 150 (emphasis added). Cason's affidavit provides sufficient evidence that the Commonwealth possessed the receipt.

borders on bad faith: The Commonwealth admits that the entire homicide file—where one may expect a document recovered by the police to exist—went missing in March 1997, before the Commonwealth had submitted its direct appeal briefing. *See* 2002 Duckworth Letter, Pet'r's Br. Ex. 77 (letter from James Duckworth, Assistant City Solicitor, to Hon. David Savitt, informing him "the location of the file is unknown and, thus, it is unavailable"). The Commonwealth may not point to a missing file and declare it the petitioner's burden to prove that the receipt was, at one point, contained inside. Moreover, the *Dennis I* court found that the police had the receipt. *See Dennis I* at 340 ("During their investigation . . . the police came into possession of a Department of Public Welfare (DPW) receipt showing that Cason cashed her check at 1:03 p.m."). As favorable evidence in the police's possession is imputed to the prosecution, there is ample evidence that the Commonwealth possessed the receipt. *See Kyles*, 514 U.S. at 437 ("the individual prosecutor has a duty to learn of favorable evidence known to others acting on the government's behalf in the case, including the police").

The Commonwealth argues that, even if it had possessed the receipt, "[i]f Petitioner was able to obtain the receipt from the Department of Public Welfare—as he says his appellate counsel did—the item was not suppressed by the Commonwealth." Commw. Resp. 43. This argument has no basis in the law. In determining whether a government's failure to turn over documents violates the second prong of *Brady*, the Third Circuit applies a three-factor balancing test: "(1) the respective knowledge of the parties; (2) [the defendant's] access to the . . . documents; and (3) the government's representations." *United States v. Pelullo*, 399 F.3d 197, 211 (3d Cir. 2005). In *Pelullo*, the court determined that the government had not violated *Brady* when it failed to turn over certain documents to the defense because of the weight of the first two factors: The defendant was well aware of the existence of these documents, and the government

repeatedly offered to make them accessible to the defendant. Thus, even though the government specifically represented to the defense that there was no exculpatory or impeaching evidence within those documents, the Third Circuit determined that the government had not improperly suppressed the evidence in contravention of its duty under *Brady*.

Those same factors make it abundantly clear that the Commonwealth had a duty to disclose Cason's welfare receipt to the defense, and that its failure to do so constitutes improper suppression under *Brady*. First, only the Commonwealth knew about the receipt. According to Cason, the police brought a copy of the receipt to the interview with her, and she in turn furnished the police with her only copy. Therefore, even if Dennis' lawyer had interviewed Cason, he would not have been able to get the receipt directly from her.[27] Moreover, he had no knowledge of the receipt's existence. Second, the defense did not have direct access to the receipt. Cason gave her only copy to the Commonwealth. For Dennis to have obtained the receipt, he would have had to first interview Cason, learn of the receipt's existence, and then go to the Department of Public Welfare himself and try to obtain a copy. It is not clear how successful these efforts would have been at the time. Regardless, that a document is publicly available does not negate the government's duty under *Brady*. Indeed, in the only Third Circuit case relied on by the Commonwealth, the court found that the government's failure to turn over the criminal record of one of its witnesses violated *Brady*. *United States v. Perdomo*, 929 F.2d 967 (3d Cir. 1991). It found a *Brady* violation despite the fact that the criminal records were publicly available, and despite the fact that the defense in that case arguably should have known about the witness' record because another lawyer from the public defender's office had represented that witness. *Id.* Here, the Commonwealth had sole knowledge of the receipt, while

---

[27] It may very well have been ineffective assistance of counsel for Dennis' lawyer to fail to interview Cason directly. However, I will reserve judgment on that claim, which Dennis has raised here and exhausted in state court, given my disposition of the *Brady* claims.

the defendant had, at best, indirect public access to it—access that is of little use if the defense is not even aware of the receipt's existence.

Finally, it is worth repeating that the Commonwealth has never argued, either before the state courts or before me, that it in fact turned over the receipt to the defense. Indeed, according to the defense team, its efforts during the direct appeal to obtain a copy of the Commonwealth's discovery inventory went completely unanswered by the Commonwealth. *See* Appellant Br. at 108-09, Pet'r's Br. Ex. 3. Uncontroverted affidavit testimony demonstrates that the Commonwealth possessed the receipt, and the clearly established rules of *Brady* and its progeny demonstrate that it was improperly withheld. The state supreme court's declaration that there is "no evidence" that the Commonwealth withheld the receipt has no basis in fact. Dennis has clearly demonstrated the second prong of *Brady*.

### c. The receipt is material.

The Commonwealth's withholding of the Cason receipt dramatically undermined the fairness of the trial Dennis received. This fact is undeniable. The state court's finding that, without this receipt, Dennis suffered no prejudice is patently unreasonable.

First, and most importantly, the receipt and Cason's accompanying corrected testimony would have provided independent, disinterested corroboration of Dennis' explanation for where he was at the time of Williams' murder. The state court unreasonably ignored the full context of both Cason's and Dennis' testimony when it declared that Cason would only have been able to say that she saw him around 2:30 p.m., which says nothing about where he was at 1:50 p.m., the time of the shooting. However, this overlooks the fact that both Cason and Dennis testified that they saw each other *on the bus*. Cason did not merely see Dennis between 2 and 2:30 p.m.; rather, she saw him on a bus that he must have boarded at some point earlier. Dennis testified

that he left his father's house around 1:50 p.m. and boarded the westbound K bus shortly

thereafter, eventually seeing Cason when he was getting off the bus at the Abbotsford Homes.

According to the Commonwealth's own SEPTA witness, the westbound K bus was scheduled to

stop at 66th and Old York Road, the closest stop to Dennis' father's home, at 1:56 p.m. and to

arrive at the intersection near Abbotsford Homes at 2:34 p.m. NT 10/14/92 at 29-31. In other

words, Cason's testimony that she saw Dennis around 2:30 p.m. would not tell merely of a single

sighting, but rather show that Dennis had boarded the bus sometime earlier than 2:30 p.m., and

would lend significant weight to Dennis' own explanation, backed by his father, that he in fact

boarded the bus around 1:50 p.m. Cason's testimony—all due to the time-stamped receipt—

would have provided invaluable corroboration that Dennis was not at the scene of the crime

when the murder took place.[28]

Cason's status as a disinterested acquaintance from the neighborhood would have

enhanced her credibility with the jury, as she had no motive to lie on Dennis' behalf. Indeed,

ADA King made much of the fact that Dennis' father provided his only alibi support, telling the

jury not to believe his father's testimony and that "blood is thicker than water." NT 10/15/92 at

95. For the same reasons, her testimony would not have been cumulative of Willis Meredith's,

who testified that he saw Dennis at Abbotsford Homes around 2:30 p.m., as Meredith was a

friend of Dennis'. Moreover, the Pennsylvania Supreme Court noted that alibi witnesses are

typically not understood to be cumulative:

> Where the defense is one of mistaken identity, and the only alibi witness
> Appellant presents is his father, it seems plain that the addition of an unrelated

---

[28] The *Dennis I* court further appears to have misconstrued the facts that Cason explained in her affidavit. It stated that her corrected testimony "would not have supported Appellant's alibi, because the murder occurred at 1:50 p.m., forty minutes earlier than Cason's earliest estimate." *Dennis I* at 408. However, Cason's "earliest estimate" of when she saw Dennis was 2 p.m.: She stated in her signed and notarized affidavit that, based on the timestamp showing when she received her welfare check, she would have seen Dennis "between 2:00 and 2:30 p.m. at the Attbottsford [*sic*] Homes." 1997 Cason Aff., Pet'r's Br. Ex. 34.

alibi witness whose testimony corroborates other testimony tending to exculpate Appellant is not "merely cumulative".

*Dennis III* at 963 n.14.

Just as the potential power of Cason's corrected testimony cannot be discounted, neither should the power of her *uncorrected* testimony—the testimony she actually gave—be underestimated. After Cason testified that she could not possibly have seen Dennis between 2 and 2:30 p.m., as he had originally told the police, Dennis was forced to qualify his trial testimony when he took the stand, saying that he only "thought" he had seen her. NT 10/14/92 at 79-80. During his closing argument, in a bizarre attempt to bolster his client's credibility, the defense lawyer told the jury, "Remember what [Dennis] told you when he got up there? It's wrong. He didn't see [Cason] on the bus. He thought he saw her on the bus, but he didn't." NT 10/15/92 at 66-67. He insisted that it was "inconsequential whether he saw her on the bus later or saw her at 4:00." *Id*. at 67. This scrambled explanation left the jury with two options, equally unhelpful to Dennis: believe that Cason and Dennis had seen each other on the bus, as both testified, but that it happened later than Dennis said—and therefore find no alibi for the time of the crime; or believe counsel's new story that Dennis was on the earlier bus, and thus could not have committed the crime, but never saw Cason at all. Cason's corrected testimony would have transformed Cason from a damaging Commonwealth witness to a uniquely powerful, disinterested defense witness who would provide document-supported corroboration for Dennis' alibi. Her testimony could very well have raised strong doubts about his guilt.

Moreover, besides substantively affirming Dennis' explanation for where he was at the time of the shooting, the time-stamped receipt would have allowed Dennis' lawyer to show that Cason testified falsely when she said she worked until 2 p.m.[29] This would have allowed defense

---

[29] Cason's testimony may have violated Dennis' due process rights on its own, as due process is violated "when the

counsel to potentially prompt Cason to recalculate her time estimates on the stand, leading her to conclude that she did, in fact, see Dennis when he indicated, between 2:00 and 2:30 p.m. If nothing else, the receipt would have allowed the lawyer to damage Cason's credibility and her estimates of what time events took place that day.

In short, the time-stamped receipt, along with Cason's consistent statement that she saw Dennis on the bus, provide strong evidence that he was nowhere near the crime when it occurred, and could not have been the shooter. It certainly raises a reasonable doubt about his guilt. The Commonwealth's suppression of the receipt, and its presentation of Cason's factually inaccurate testimony, violated Dennis' due process rights: Had the receipt been disclosed, there is a reasonable probability he would not have been convicted. The state court was manifestly unreasonable to conclude that the receipt was not favorable to the defense, that there was "no evidence" it was suppressed, and that no prejudice resulted from its suppression. No fair-minded jurist could evaluate this evidence and find it to be anything less than powerful corroboration of Dennis' alibi. Dennis is therefore entitled to a new trial.

### C. Howard Statement

Dennis' third *Brady* claim stems from a police activity sheet relating to statements from Williams' aunt and uncle, the Pughs. The Pughs told police that Zahra Howard had told them, shortly after the murder, that she recognized the shooter from her high school and that two people she knew, "Kim" and "Quinton," were there. The activity sheet notes that Quinton was Diane Pugh's nephew. This activity sheet was never turned over to the defense. There is no question that this statement was helpful to the defense and that it was suppressed by the Commonwealth. The only question is whether it is "material": whether there is a reasonable

_____

State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Arguably, the Commonwealth knew or should have known that Cason was wrong when she said she worked until 2 p.m., or that she picked up her check around 3 p.m. However, I reserve judgment on this claim.

probability that its disclosure would have led to a different result.

### 1. State Court Decision

Dennis raised this claim in his 2002 PCRA petition. The PCRA court ignored the issue and did not address it in its opinion. On appeal, the Pennsylvania Supreme Court rejected the Commonwealth's argument that the activity sheet could not be *Brady* material because it was inadmissible hearsay and because it was not determinative of guilt or innocence:

> The Commonwealth's attempt to downplay the value of the activity sheet, or the content thereof, to trial counsel in formulating a mistaken-identity defense fails. Its characterization of the activity sheet as "inexact" . . . is non-responsive with regard to the claim that the report would have led trial counsel down new investigative avenues that had the potential to materially undermine the prosecution's case.

*Dennis III* at 969. Indeed, as the court noted, the police listed under "THINGS TO DO" on the activity sheet their intention to interview the Pughs and Howard. "Thus, any suggestion that the lead was insufficiently material from an investigatory point of view is belied by the Activity Sheet itself, regardless of whether investigators ultimately made good on the intention." *Id*. at 969 n.24. Moreover, the court noted, Dennis "expressly couches the utility of the evidence in its value as impeachment . . . and thus resists the claim of inadmissibility." *Id*. at 969. Ultimately, however, the court determined that it could not issue a ruling on the record before it, and remanded to the PCRA court.

The PCRA court held an evidentiary hearing. Dennis sought to argue the merits of the *Brady* claim on the papers; he objected to the introduction of evidence from Howard and Diane Pugh because, he argued, their recollections now, a decade after the trial, about who the shooter was or what they told the police had no relevance on the question of whether the Commonwealth had violated *Brady* by failing to disclose the activity sheet. As Dennis' PCRA counsel told the court:

> The testimony has to be evaluated in its trial context. And all we can do at this point is put on paper for the court what we expect the impeachment to have been, assuming, for example, Zahra Howard denies having made the statement. We have to demonstrate on paper how she could have been impeached, and how that evidence relates to other evidence in the case. . . . Her testimony today about what she remembers from 16 years ago we can cross-examine, but it doesn't illuminate the question of materiality in the context of the trial.

NT 12/22/08 at 15. The court allowed the testimony over Dennis' objections. As expected, both Howard and Pugh denied that Howard had ever suggested that she recognized the assailants. Pugh's testimony should not carry much weight, however, given that she declared before she was even sworn in, "I don't remember nothing, nothing at all. It's been 15, 16 years so I don't remember. They just subpoenaed me and I'm here." *Id*. at 56.

The PCRA court ultimately rejected the *Brady* claim. It noted that, during the hearing, Howard "testified credibly that she did not know the appellant from Olney High School, nor had she seen him prior to the murder." *Commonwealth v. Dennis*, Case No. 92-01-0484, slip op. (Pa. Ct. Com. Pl. Mar. 17, 2010), at 13. Although the question whether Howard recognized *James Dennis* ("the appellant") or had seen him before the murder is entirely irrelevant to whether she told Diane Pugh that she had seen the *shooter* before the murder, this is, in fact, the entirety of the testimony that the Commonwealth elicited from Howard at the PCRA hearing:

> Q: And in that conversation [with Diane Pugh] did you ever say anything about recognizing the defendant before?
> A: No.
> Q: Did you ever see the defendant at Olney High School?
> A: No.
> Q: Did you ever see him around Olney High School?
> A: No.

NT 12/22/08 at 18. On cross, when Dennis' lawyer asked her about whether she said she had ever seen *the shooter* before, or whether she had ever told anyone she recognized *the shooter* from Olney High School, Howard denied recognizing the shooter or having ever said she did. *Id*.

at 25-27.

Given both trial and PCRA counsel's thorough cross-examination of Howard, the PCRA court determined that it was "unlikely that any additional impeachment evidence contained in the police activity sheet . . . would have created a reasonable probability that the result of the proceeding would have been different had it been disclosed." *Dennis*, slip op. at 14. The court further noted that the government's case at trial "did not rest solely on" Howard's testimony. *Id*. Finally, the contents of the activity sheet amounted to inadmissible hearsay, which "cannot be the basis for a *Brady* violation." *Id*. at 15.

The Pennsylvania Supreme Court largely accepted the PCRA court's determinations, despite its seeming recognition, in *Dennis III*, of the investigatory value the activity sheet would have had and its earlier dismissal of the admissibility issue. It agreed that Dennis had failed to prove a reasonable probability of a different result had the activity sheet been disclosed. *Commonwealth v. Dennis*, 17 A.3d 297, 309 (Pa. 2011) ("*Dennis IV*"). It echoed the PCRA court in noting that "Howard was extensively cross-examined by defense counsel in an attempt to impeach her testimony during trial," and that "there were two eyewitnesses other than Howard" who identified Dennis; "[t]he disclosure of the activity sheet would have had no impact upon these eyewitnesses' testimony." *Id*. It did not specifically address the question of admissibility.

### 2. AEDPA Analysis

The Pennsylvania Supreme Court's ruling unreasonably misapplied *Brady* and *Kyles* in three different ways. First, it unreasonably discounted the impeachment value of the evidence, and incorrectly concluded that because Howard had been cross-examined on other topics, new impeachment evidence would not have been material. The Supreme Court has directly rejected the notion that there can be no *Brady* claim relating to impeachment evidence where a witness

was already impeached with other information. *See Dretke*, 540 U.S. at 702 (rejecting state's argument that no *Brady* violation occurred because the witness was "heavily impeached at trial," where the withheld evidence was the only impeachment evidence that the witness was a paid informant). Indeed, at trial, Howard specifically denied on cross that she had seen the two assailants before. NT 10/5/92 at 23. Without this activity sheet, counsel had no opportunity to effectively cross-examine her or impeach her credibility on this point.

Moreover, while Howard was *cross-examined* at trial, her credibility was never *impeached*. Counsel's cross-examination consisted in showing her hesitation in picking Dennis' photo out of the array and identifying Dennis at the lineup, and to eliciting her original statement to the police that the shooter was relatively tall. Therefore, the importance of the activity sheet— in that it would have provided the defense's sole source of credibility impeachment against Howard—is even greater than other cases where courts have found *Brady* violations where the evidence could have provided only *additional* impeachment. As the Third Circuit stated, "[I]t is patently unreasonable to presume—without explanation—that whenever a witness is impeached in one manner, any other impeachment becomes immaterial." *Lambert v. Beard,* 633 F.3d 126, 134 (3d Cir. 2011) *cert. granted, judgment vacated on other grounds Wetzel v. Lambert*, 132 S. Ct. 1195 (2012). *See also Slutzker v. Johnson*, 393 F.3d 373, 387 (3d Cir.2004) (holding that although the defendant was able to impeach the prosecution in certain respects, the suppressed information was material under *Brady* because there was a "significant difference" between the suppressed material and the information to which the defense had access); *Perdomo*, 929 F.2d at 969, 972 (rejecting the district court finding "that the jury had an opportunity to evaluate the informant's credibility from other damaging testimony" and concluding that "[w]hether or not the jury has had an opportunity to consider other impeachment evidence is not the correct

standard for determining materiality of undisclosed information"). Here, Howard's credibility was never impeached at trial, so it is even more unreasonable to declare that her inconsistent statement in the activity sheet would have made no difference.

Had trial counsel been able to ask Howard about previous inconsistent statements she had made that suggested she had, in fact, recognized the shooter from her high school, it could very well have tipped the scales of credibility against her identification of Dennis. After all, the activity sheet would have shown that she either lied to Williams' close relatives—only days after the murder and in a manner that implicated Diane Pugh's own nephew—or she was lying at trial. Combined with her hesitating identification of Dennis and her description of the shooter as much taller than Dennis, this impeachment could have seriously damaged Howard's credibility and undercut her entire testimony. Howard's central importance to the Commonwealth's prosecution cannot be understated: She was next to Williams when they were first confronted by the assailants, and watched the entire shooting occur. Given Howard's role, therefore, it is reasonably probable that, had the activity sheet been disclosed, Dennis would not have been convicted. That Howard was cross-examined about her identification of Dennis has no relevance to the question of whether cross-examination as to her credibility would have made a difference at trial.[30] The Pennsylvania Supreme Court's rejection of the *Brady* claim for the mere reason that Howard was subjected to some sort of cross-examination was therefore an unreasonable application of federal law.

Second, the *Dennis IV* court's determination that the activity sheet evidence would not

---

[30] Indeed, the *Dennis IV* court's rejection of the claim notwithstanding, the very same court, in *Dennis III*, specifically recognized the value the activity sheet could have had in impeaching Howard: "Howard was beside the victim at the beginning of the encounter, and was one of three eyewitnesses to identify Appellant at trial. We cannot conclude on the record before us that successful impeachment of her testimony would not have changed the outcome at trial." *Dennis III* at 969 n.25. Although the *Dennis III* court remanded for an ultimate determination, its recognition of the potential importance of effective impeachment further underscores the *Dennis IV* court's unreasonable decision otherwise.

have affected the other two eyewitness' testimony runs directly counter to *Kyles*' clear statement that materiality "is not a sufficiency of the evidence test." *Kyles*, 514 U.S. at 434. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id*. at 434-35. Indeed, the *Kyles* Court rebuked the dissent for assuming that Kyles must lose on his *Brady* claim because there would still have been enough evidence to convict, even if the favorable evidence had been disclosed. "The rule is clear, and none of the *Brady* cases has ever suggested that sufficiency of the evidence (or insufficiency) is the touchstone." *Id*. at 435 n.8. Evidence does not have to upset every aspect of the prosecution's case to be material under *Brady*; rather, the question is whether the defendant received a fair trial in the absence of the undisclosed evidence.

Third, the court failed to consider the effect of the activity sheet on trial counsel's investigation, pretrial preparation, or decision to interview or call the victim's relatives, and failed to consider the effect of exposing detectives' shoddy investigation in failing to ask Howard about these statements. As explained above, *Brady* materiality encompasses the value of the evidence to the defense's investigation and preparation. *See Bagley*, 437 U.S. at 683 (a court must consider "any adverse effect that the prosecutor's failure . . . [to disclose the evidence] might have had on the preparation or presentation of the defendant's case"). Again, the *Dennis III* court had recognized the potential investigatory value of the activity sheet, noting the police's stated intention, in its "THINGS TO DO" list, to follow up with Howard about the Pughs' statement. "Thus, any suggestion that the lead was insufficiently material from an investigatory point of view is belied by the Activity Sheet itself." *Id*. at 969 n.24. Mysteriously, the *Dennis IV* court completely ignored this important aspect of *Brady* materiality.

The Pennsylvania Supreme Court's rejection of this *Brady* claim unreasonably applied

*Brady* and its progeny by (1) unreasonably dismissing the impeachment value of the evidence and incorrectly concluding that some cross-examination negates the materiality of new impeachment evidence; (2) incorrectly applying a sufficiency of the evidence test, in direct contravention to *Kyles*; and (3) utterly failing to consider the value the information would have had to the defense's investigation and trial preparation. Together, these flaws show the unreasonable nature of *Dennis IV*'s conclusion. The activity sheet was unquestionably favorable to the defense, withheld by the government, and material. Had it been disclosed, there is a reasonable probability that the jury would have rejected Howard's already shaky identification and acquitted Dennis. When the Commonwealth denied Dennis the ability to impeach the most important eyewitness in the government's case, it denied him a fair trial.

### D. Cumulative Analysis

The Frazier documents, the Cason receipt, and the activity sheet with Howard's statements were favorable to the defense, withheld by the Commonwealth, and material to Dennis' guilt or innocence. Had they been disclosed, there is a reasonable probability that Dennis would not have been convicted of Williams' murder. For the reasons explained above, I find that all three pieces of suppressed evidence are material for the purposes of *Brady*, and that the state courts' findings otherwise were unreasonable. Each claim is sufficient, on its own, to warrant habeas relief. However, even if the claims were insufficient on their own to show materiality under *Brady*—if the withholding of Frazier's and Howard's statements and Cason's receipt did not, in fact, deny Dennis a fair trial—together, their non-disclosure meets the *Brady* materiality standard. Cumulatively, the prejudicial effect of their suppression by the Commonwealth cannot be denied. This cumulative prejudice therefore provides a separate basis for granting habeas relief.

As a threshold matter, I need not defer to the Pennsylvania state court decisions here, because neither *Dennis III* nor *Dennis IV* examined the cumulative prejudice of these *Brady* claims. In *Dennis III*, the Pennsylvania Supreme Court noted Dennis' argument that "the cumulative effect" of the various pieces of suppressed evidence, "if no particular non-disclosure individually, was sufficiently prejudicial to warrant relief." *Dennis III* at 965. However, it remanded the Howard claim and therefore did not conduct a cumulative analysis. In *Dennis IV*, the same court failed to even mention the cumulative prejudicial effect of the *Brady* claims. As a result, AEDPA deference does not apply and I review this claim *de novo*. *See Simmons*, 590 F.3d at 233 ("Finally, we do not defer to the Pennsylvania Supreme Court on the question of the cumulative materiality of the prosecution's *Brady* violations because . . . the court did not reach the issue of the collective effect of multiple violations").

As *Kyles* explained, the materiality of withheld evidence must be "considered collectively, not item by item." *Kyles*, 514 U.S. at 436. For the reasons explained above, the Frazier documents, the Cason receipt, and the activity sheet would have provided unique and important investigatory leads for the defense. Together, their investigatory value is even clearer, and would have significantly bolstered the defense's existing attempts to question the identification of Dennis. For example, the Frazier documents would have allowed the defense to investigate other suspects whose size more closely matched the eyewitness descriptions of the shooter. Howard's statement to the Pughs that she recognized the assailants from Olney High School fits in with Frazier's statement that Walker and Brown were the assailants, because Walker told police that he knew the victim from Olney High School. *See* 11/2/91 Activity Sheet, Pet'r's Br. Ex. 73. Armed with both sets of documents, therefore, the defense would have had a substantial lead worthy of serious investigation.

For the same reason, the combination of all three sets of documents would have allowed the defense to forcefully attack the adequacy of the Commonwealth's investigation. Defense would have had a strong case to make that the Commonwealth abandoned promising leads: Police failed to meet with Frazier's aunt, to verify Walker's alibi, or to include Walker and Brown in photo arrays or line-ups; police also failed to follow up with Howard about the statement she allegedly made to the Pughs, to take a formal statement from the Pughs, or to interview Quinton. The Commonwealth allowed Cason to testify incorrectly that she worked until 2 p.m., and failed to investigate Dennis' alibi given the actual timing of Cason's activities. Discrediting the investigation is a crucial corollary to presenting an innocence/alibi defense: If the defense could lead the jury to believe that the Commonwealth conducted a shoddy investigation, the jury would have been more likely to listen to and believe Dennis' alibi.

Further, the cumulative impeachment value of the undisclosed evidence cannot be understated. These documents would have impeached Howard, the Commonwealth's most important eyewitness. They would have simultaneously impeached Cason's testimony that she worked until 2 p.m. while corroborating Dennis' alibi. The evidence would have allowed defense to undermine the credibility of the testifying detectives who investigated this crime. Together, this evidence would have dramatically undercut many of the Commonwealth's witnesses and the case against Dennis.

In short, the Frazier documents, the Cason receipt, and the Howard statement, together, would have proved immensely cogent to the defense in pointing to an entirely new and otherwise unknown investigatory path, in strongly supporting Dennis' alibi, and in seriously discrediting the investigation that led to Dennis' arrest. The withholding of these essential documents denied Dennis a fair trial. As a result, even if the documents on their own are insufficient to show

materiality under *Brady*, the cumulative effect of their non-disclosure requires habeas relief.

**V.     CONCLUSION**

I am concerned that James Dennis was wrongfully convicted and sentenced to die for a crime he did not commit. Regardless of Dennis' possible innocence, there can be no question that the Commonwealth violated his right to due process of law by withholding exculpatory evidence that would have made a difference at his trial. As a result, after serving over 20 years in prison, Dennis is entitled to receive either a new trial or his freedom.


_____/s/ Anita B. Brody_____
ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:     Copies **MAILED** on _____ to: